J. L. Jones v. Commissioner. J. L. Jones and Virgie E. Jones v. Commissioner.
Jones v. Commissioner
Docket Nos. 57636, 57637.
United States Tax Court
T.C. Memo 1960-282; 1960 Tax Ct. Memo LEXIS 5; 19 T.C.M. (CCH) 1549; T.C.M. (RIA) 60282; December 30, 1960
*5 1. Held, that in applying the net worth method herein, no adjustment should be made to the opening net worth as found, to reflect an adjusted basis for slot machines. 2. Held, that during each of the years 1942 through 1946, the principal petitioner held coin-operated machines primarily for sale to customers in the ordinary course of a business; and that he is not entitled to capital gain treatment with respect to any portion of the proceeds from the sales of machines which he sold in such business. 3. Held, that at least part of the deficiency for each of the years 1944 through 1947, is due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code. Bruce Gebhardt, Esq., Law Bldg., Charlotte, N. C., and Ernest S. DeLaney, Jr., Esq., for the petitioners. Raymond Whiteaker, Esq., and Richard C. Forman, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in petitioners' income taxes, and also additions to tax for fraud, as follows: Addition to tax
Docket No.
Petitioner
Year
Deficiency
Sec. 293(b)
57636
J. L. Jones
1942
$12,432.12
$ 6,216.03
1943 * *6 15,591.77
7,795.89
1944
26,236.23
13,118.12
1945
69,534.79
34,767.40
1946
14,065.57
7,032.79
1947
16,722.89
8,361.45
57637
J. L. Jones and Virgie
E. Jones
1948
211.22
105.61
The cases were consolidated for trial. All of the above deficiencies were determined by use of the so-called net worth method. The scope of the controversy is affected by the following stipulations, concessions, and claim to increased deficiency - all of which will be given appropriate effect: (a) Stipulation that, in applying the net worth method to prove increases in the net worth of petitioner J. L. Jones during the years 1942 through 1947, the assets and liabilities of Jones' spouse and children should not be combined with his assets and liabilities. (b) Concession by petitioners that assessment and collection of liabilities are not barred by the statute of limitations for any of the taxable years involved. (c) Abandonment by respondent of his claim to additions to tax under section 293(b) for the years 1942, 1943 and 1948. (d) Claim of respondent to an increased deficiency for the taxable year 1943 presented in respondent's answer to the petition in Docket No. 57636. This claim is based on the ground that, by the elimination of any addition to tax for fraud in respect to the preceding taxable year 1942, an increase in the deficiency for 1943 will result under the *7 provisions of section 6 of the Current Tax Payment Act of 1943. (e) Stipulation of the parties that petitioner J. L. Jones is entitled to a net operating loss carryback from the year 1949 to the year 1947, in the amount of $17,116.76. The issues remaining for decision are: (1) Whether, in applying the net worth method herein, there should be included in the opening net worth of petitioner J. L. Jones as of December 31, 1941, any amount to represent an adjusted basis of slot machines then on hand. (2) Whether, for any of the years 1942 through 1946, petitioner J. L. Jones is entitled to have his taxable income reduced by any amount, to reflect long-term capital gain treatment in respect of some portion of his gains from sales of coin-operated machines. (3) Whether at least part of any deficiency for any of the years 1944 through 1947 is due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits thereto attached, is incorporated herein by reference. Petitioners J. L. Jones and Virgie E. Jones are husband and wife, residing in Hickory, North Carolina. They filed separate income tax returns for each *8 of the years 1942 through 1947, and a joint return for the year 1948. All these returns were filed with the collector of internal revenue for the district of North Carolina. Facts re Petitioner's Sources of Income During all years from 1932 through 1946 (only the last five of which years are here directly involved), petitioner J. L. Jones (hereinafter called the "petitioner") was engaged in a business which involved one or more of the varying activities of owning, operating, buying, rebuilding or reconditioning, and selling slot machines, juke boxes, and other coin-operated machines. He carried on such business activities as a sole proprietor, at times under the name of Jones Music Company, but principally during the latter portion of said period under the name of Jones Sales Company. In 1946 he discontinued all such activities; and from then on he operated a furniture manufacturing business as a sole proprietor, under the name of Jones Manufacturing Company. Petitioner's activities as an operator of coin-operated machines began in 1932, when he purchased several slot machines, placed them in various retail establishments in or near Hickory, and operated them under arrangements whereby *9 the collections therefrom were divided with the owners of the establishments in which the machines were located. Soon thereafter, he also acquired and began to similarly operate a number of coinoperated phonographs (commonly known as "juke boxes"), pinball tables and other amusement machines. His business expanded rapidly. By about 1936, he had coin-machines operating on several routes, not only in Hickory but also in five or six surrounding North Carolina counties; he maintained a principal office and place of business in Hickory; he retained both a bookkeeper and an outside accountant (Risch) to handle his accounts; and he had from 12 to 15 other employees who serviced his machines and attended to the collections therefrom. The statutes of North Carolina had, since about 1923, made it unlawful for any person to possess or operate slot machines of the type which petitioner owned and operated; [1] but until about 1937, such statutes apparently were not strictly enforced. In 1937, however, the criminal laws of North Carolina pertaining to slot machines and other gambling devices, were amended, extended and strengthened; [2] and from then on the enforcement of such laws was increasingly *10 intensified. Upon the enactment of said 1937 amendments to the North Carolina statutes, petitioner became concerned as to the hazards of operating his business; and accordingly, he at that time withdrew from his routes and placed in storage most of his coinoperated machines other than his juke boxes which were not affected by the new statute. Soon however, he became more bold; and thereupon he gradually reinstalled at least some of his slot machines, by adopting the practice of either concealing them in specially constructed cabinets where they could quickly be hidden from view, or by placing them in the back rooms of selected establishments. In about July 1942, a North Carolina law enforcement officer in one of the neighboring counties was slain, allegedly by slot machine operators. Petitioner, upon learning of this *11 event, became greatly alarmed lest law enforcement measures might become even more vigorous, and lest his machines might be confiscated. Accordingly, he at that time picked up from his routes and his Hickory warehouse, practically all of his slot machines; and he then shipped them out of the state, first to Tennessee and then to Bristol, Virginia. The Virginia statutes, like those of North Carolina, specifically provided, both at that time and at all other times here material, that it was unlawful for any person to own, possess, operate, manufacture, lease or sell any slot machine of the type which petitioner possessed; [3] but it was the belief of petitioner that enforcement of such laws in Virginia might be less strict than in North Carolina. Petitioner's slot machines arrived in Bristol on about July 22, 1942. They were of several different types; and the evidence herein does not establish as to any particular machine, either: When it first was acquired by the petitioner; whether it was new or used at the time of such acquisition; *12 how long it had theretofore been operated either by petitioner or some prior owner, or whether it had been rebuilt or reconditioned by petitioner subsequent to the time of its acquisition by him; to what extent its original cost to petitioner might already have been subject to depreciation allowed or allowable; or what its adjusted basis to petitioner was, either at the close of the year 1941 or at the time it was shipped to Bristol. At about the same time that petitioner shipped these slot machines to Bristol, the manufacture in the United States of new coin-operated machines of all types was discontinued because of the wartime restrictions imposed upon the use of metals and other materials. Because of this situation, petitioner thereupon concluded that there would soon develop an increasing demand for used slot machines, and particularly for those which could be so reconditioned and rebuilt as to put them in good working condition. Accordingly, he decided not only to sell many of the slot machines which he then possessed, but also to purchase for reconditioning and resale such additional slot machines as he might be able to acquire from other operators who were entering the military *13 service, or were for other reasons discontinuing their slot machine operations. Actually, during the ensuing years from 1942 through 1946, the prices at which used slot machines and other coin-operated machines were bought and sold did, as petitioner had anticipated, increase substantially. Petitioner's new business venture of purchasing, rebuilding and selling used slot machines was carried on by him during the years 1942 through 1946, principally in Bristol, Virginia. He there established a branch warehouse and office, although he still continued to maintain his principal place of business in Hickory, North Carolina; and he placed one of his more experienced assistants named Huggins, in general charge of this Bristol branch. Huggins there assumed the duties of receiving such machines as petitioner shipped to him, including both machines on hand and machines bought for resale; supervised the several mechanics and workmen who reconditioned and rebuilt the same; and also handled the crating and shipment of the rebuilt machines to such locations and purchasers as petitioner directed. Petitioner himself did all the buying and selling for such new business activity. The procedure was substantially *14 as follows. Whenever petitioner learned of a slot machine operator who was planning to discontinue his operating activities, petitioner would contact him and attempt to arrange for the purchase of the machines. In some instances, he would pay the seller at the time of the purchase; but in other instances, he would arrange for the seller to ship the machines to Bristol on a C.O.D. basis, or on a bill of lading with sight draft attached. Thereafter, when the machines arrived at Bristol, Huggins would receive them and pay from a bank account which petitioner established for use in Bristol, any portions of the purchase price and any shipping charges which might be due thereon. The slot machines were then put into the repair shop at Bristol, where they were so reconditioned, repaired, and rebuilt as to put them in first class working condition. Following such renovation, they were crated and shipped to purchasers in conformity with petitioner's instructions. One of the methods which petitioner employed to find customers for his reconditioned slot machines was to advertise in various trade journals published for the coin-machine business. He also sought to attract purchasers by creating *15 good will among his "customers," and by establishing a reputation for selling only machines which had been placed in first class working condition. He sold most of his rebuilt machines to other slot machine operators. One of his best "customers" was an operator in California, who at one time bought 200 machines, and later bought 40 more. In some instances, petitioner might receive an order for 50 machines of a particular type, of which he had only 10 available; and in such circumstance, he would then, at the customer's request, locate and purchase sufficient additional machines to fill the order. Some of the machines shipped from the Bristol branch office were billed to the purchaser on a C.O.D. basis, or on bills of lading with sight drafts attached. As to these, Huggins would thereafter receive the sales collections and deposit them in the above-mentioned Bristol bank account. As to other machines shipped from Bristol, petitioner sometimes personally received the payments therefor; and in some of these situations, he personally retained the proceeds, without having the sale recorded on the books of the Jones Sales Company, and without depositing the proceeds in the bank account of *16 such proprietorship. Huggins maintained at Bristol, certain records of the various machines which he received at, and shipped from, the branch office in that city; and he also maintained records of the payroll for himself and the other employees in that office. He then periodically sent to the bookkeeper at the main office of the Jones Sales Company in Hickory, reports regarding the foregoing matters; and he also transmitted to said bookkeeper, his duplicate bank deposit slips and canceled checks. Huggins had no knowledge as to how the books of account at Hickory were maintained, or as to how the various transactions which he handled in Bristol were reflected on the accounts at that main office; and also, neither petitioner nor any employee of his who appeared as a witness herein, had any knowledge of how said accounts were maintained. In petitioner's income tax return for the year 1942, he for the first time described his occupation as a "jobber"; and also on that return, he for the first time described the income of the Jones Sales Company as being that from a "jobbing business." Such designation of his occupation as being that of a "jobber, " was included also in his 1943 and 1945 *17 returns; and it was not until his 1946 return that he reported for the first time that he was "liquidating" his coin-machine business. Also on his 1942 return, petitioner employed inventories for the first time to compute the cost of goods sold by his Jones Sales Company; and also therein for the first time, he claimed depreciation on behalf of said company, only on furniture, fixtures, automobiles and trucks. On his preceding return for the year 1941, he had used no inventories, and he had taken depreciation also on coin-operated machines "used" in the business, as distinguished from any machines "sold" in such business. The following summary of the inventories for the Jones Sales Company for the years 1942 through 1946, as reported on petitioner's income tax returns for said years, shows the following amounts of the opening inventories, the total costs of machines and reconditioning parts purchased each year, and the amounts of the inventories remaining at the end of the several years: Opening
Cost of Ma-
Total Cost
Cost of
Machines
Inventory
chines
Reconditioning
of Machines
in Inventory
Purchased
Year
Jan. 1
During Year
Costs
Available for Sale
at End of Year
1942
$38,897.96
$ 57,912.16
$ 2,591.59
$ 99,401.71
$44,437.12
1943
44,437.12
155,957.02
31,934.76
232,338.90
46,687.40
1944
46,687.40
76,574.27
28,287.83
151,549.50
6,765.80
1945
6,765.80
54,820.73
8,448.82
70,035.35
1,250.00
1946
1,250.00
1,015.25
2,265.25
*18 Labor expenses incurred in connection with the rebuilding and repairing of machines were deducted as current operating expenses. For the years prior to 1942, petitioner computed depreciation for the machines which he used on his routes on the basis of a useful life of three years; and this was the correct useful life of such equipment. In addition to petitioner's above-described activities relating to the purchase and sale of used slot machines at Bristol during the years 1942 through 1946, he also, during this same period, continued to operate coin machine routes in and around Hickory. The machines so operated were principally juke boxes and pinball machines; but he also continued to operate slot machines. A cash receipts and disbursements journal maintained in Hickory by the bookkeeper for the Jones Sales Company reflects collections from the machines on the routes, as follows: Year
Amount
1942
$31,373.42
1943
14,539.11
1944
11,823.88
1945
2,060.37
During said 1942-1945 period, petitioner gradually sold most if not all of his route machines, as well as machines which he purchased for resale. Petitioner retained portions of the money which he received from sales of some of the slot machines *19 from his routes, without recording the sales on the books of the Jones Sales Company or depositing the proceeds in that company's bank account. By early 1946, petitioner had sold all his slot machines, juke boxes and pinball tables - including both those which he had previously used on his routes, those which he had shipped to Bristol in July 1942, and those which he had purchased for reconditioning and resale. The record does not disclose, as regards any particular machine which he sold: When he had acquired it; or whether it was a machine which he had theretofore used on his routes; or what was its selling price; or what was petitioner's adjusted basis, if any, therefor. As heretofore found, petitioner entered a furniture manufacturing business in the early part of 1946 as a sole proprietor, trading under the name of the Jones Manufacturing Company. At all subsequent times material, petitioner has been engaged in such business. In addition to petitioner's above-described proprietorship activities of operating the Jones Sales Company and the Jones Manufacturing Company, he in 1942 owned three poolrooms: The Henkel Pool Room and the Paramount Billiards, both located in Hickory; and *20 a third poolroom (also bearing the name of Paramount Billiards), located in Mooresville, North Carolina. As of January 1, 1943, petitioner transferred the Henkel Pool Room to his wife; and on the same date, he made a gift of the Paramount Billiards poolroom in Hickory to his two minor children. Also, as of January 1, 1944, petitioner gave the Paramount Billiards poolroom in Mooresville to said two minor children. During the period from 1944 through 1947, petitioner made large additions to his investments in stocks and bonds. As of December 31, 1943, he had only $1,575 face amount of Government bonds, and shareholdings in only six corporations, and two building and loan associations - the costs of all such investments being $10,850. Thereafter, at the end of each of the years 1944 through 1947, the amounts of petitioner's total investments in stocks and bonds, and the number of corporations in which such investments were held, were as follows: Number of
Total Stock
Corporations
Year Ended
and Bond
in Which Invest-
December 31
Investments
ments Were Held
1944
$ 60,305.22
20
1945
413,736.26
64
1946
220,658.50
52
1947
222,954.00
55 These shareholdings yielded dividends which petitioner reported on his returns *21 for 1945, 1946, and 1947, in the respective amounts of $4,358.22, $9,956.44, and $14,005.06. Also during the year 1945, petitioner reported that he had engaged in 14 short-term and 9 long-term securities transactions, which yielded a total net gain of $6,571.52. Petitioner, in 1945, substantially increased the amount of insurance which he carried on his life. Payment of premiums on life insurance policies made by petitioner during each of the years 1942 through 1947 were as follows: 1942
$ 595.82
1943
595.82
1944
595.82
1945
5,337.76
1946
5,337.76
1947
5,491.61
During each of the taxable years 1942 through 1947, petitioner had rental properties from which he reported income as follows: Year
Gross rents
Net rents
1942
$1,242.27
$ 910.78
1943
1,243.00
831.60
1944
1,270.00
736.96
1945
1,876.00
1,248.02
1946
1,655.00
1,272.61
1947
500.00
450.00
During the years 1943 through 1947, petitioner made at least the following sales and purchases of real estate: Sales of Real Estate
Purchases
Cost
Payment
of real
Year
Basis
Received
estate
1943
$ 340.00
*
$ 800
1944
2,050.00
*
5,500
1945
23,550
1946
14,244.85
$31,000.00
13,200
1947
1,500.00
2,993.40
Petitioner's Books and Records With respect to the Jones Sales Company, petitioner, *22 at all times subsequent to about 1935, employed a bookkeeper at his principal office in Hickory, who maintained a cash receipts and disbursements journal, and also a general ledger. Petitioner personally took no part in maintaining such books of account, and he disclaimed any knowledge of their contents. As heretofore found, not all the proceeds which he received from sales of slot machines were included on said books of account. No bookkeeper or other person familiar with the maintenance of such books of account testified regarding them. Petitioner did not maintain any books of account for his other individual activities, covering such matters as his purchases and sales of securities and real estate, his dividend income, or his rental income. The record does not indicate what, if any, books of account were maintained with respect to his operations of the above-mentioned poolrooms. In the fall of 1951, agents of the respondent conducted an examination of petitioner's books and records, in connection with their audit of his tax returns for the taxable years 1942 through 1948. The agents found that there had been numerous unexplained deposits by petitioner and his wife in personal bank *23 accounts and with stock brokers; and also that petitioner had made investments in various businesses, with funds which could not be satisfactorily accounted for. Also the books and records relating to the Jones Sales Company were incomplete as to any particular year of the operation of that business, and there were no supporting records for the entries shown in the books. [4] In the foregoing circumstances, respondent's agents decided that the net worth plus nondeductible expenditures method should be employed to compute petitioner's income. The agents' initial computation of petitioner's net worth for the years 1942-1947 included both assets and liabilities attributable to petitioner's wife and children. In a protest thereafter filed by petitioner, such inclusion of assets and liabilities of the wife and the children was claimed to be erroneous. And also, although petitioner contended in said protest that use of the net worth method was not justified, *24 he did "for the purpose of discussing the matter with the Internal Revenue Department," append to such protest a net worth computation compiled by his own representatives. This net worth statement submitted by petitioner eliminated all assets and liabilities of his wife and children; and it also made an adjustment to eliminate from income, certain amounts which he claimed represented 50 per cent of gains realized from sales of coin machines used in his operation of the Jones Sales Company. Included among the assets on the net worth statement submitted by petitioner was an item labeled "Jones Sales Co." in the amount of $73,081.08 as of December 31, 1941; and in a supporting balance sheet of said company attached to said net worth statement, there was an asset designated "Machines used on routes" as of December 31, 1941, in the amount of $38,897.96. Subsequently, respondent issued the notice of deficiency to petitioner in Docket No. 57636 for the years 1942 through 1947, wherein deficiencies in income tax were computed upon a net worth basis. Included among the assets of petitioner in this net worth statement attached to the notice of deficiency, were certain assets and liabilities *25 of petitioner's wife and children. Also included therein was an item representing the net investment of petitioner in the Jones Sales Company as of December 31, 1941, of $50,098.28 - which item included the adjusted basis of coin machines on hand as of said date, in the above-mentioned amount of $38,897.96. At some time subsequent to the issuance of said notice of deficiency, and prior to the time this case was set for trial, respondent's representatives were informed that petitioner planned to contend at the trial that the amount of petitioner's opening net worth as shown in the notice of deficiency was understated, on the ground that it failed to include in petitioner's investment in the Jones Sales Company, any amount for slot machines on hand as of December 31, 1941. Thereupon, an agent of the respondent was sent to investigate this new claim to additional assets. Said agent conferred with the certified public accountant (Fechhelm) employed by petitioner; and he was supplied by this accountant with a record of the aggregate annual purchases of coin machines by the Jones Sales Company, which were shown on its cash receipts and disbursements journal for the years 1936 through 1941. *26 The agent then deducted therefrom the depreciation allowed or allowable on such machines from the dates of their purchase to December 31, 1941; and, by such method, he arrived at an adjusted basis for coin machines on hand as of December 31, 1941, which was only $700 less than the above-mentioned $38,897.96 that respondent had used in his deficiency notice. The source of this amount of $38,897.96 so used by the respondent was petitioner's 1942 Federal income tax return, whereon this same amount was designated as "Inventory 12-31-41 (Depreciated Cost)." Also as hereinbefore found, this same amount had been used by petitioner in the net worth statement which he had himself submitted to respondent in connection with his protest. The following is a correct statement [5] of: (1) Petitioner's assets and liabilities as of December 31, 1941, through 1947; (2) petitioner's nondeductible expenditures, gifts and living expenses, for each of the years 1942 through 1947; (3) capital gain adjustments attributable to petitioner's securities transactions for the years 1942 through 1947; and (4) petitioner's net taxable income, as computed by the net worth method, for each of the years 1942 through 1947: *27 ASSETS
12-31-41
12-31-42
12-31-43
12-31-44
Cash in banks
$ 437.00
$ 3,835.03
$ 26,475.03
Henkel Pool Room
5,380.48
$ 13,522.23
Paramount Billiards - Hickory
10,380.04
Paramount Billiards -
7,841.64
6,563.50
8,076.56
Mooresville
Jones Sales Co.
50,098.28
59,748.32
89,719.70
62,740.71
Jones Manufacturing Co.
Real estate
34,429.02
15,097.23
15,226.04
17,844.55
Stocks and bonds
16,381.00
12,600.00
15,150.00
60,305.22
Notes receivable
5,150.00
15,550.00
13,550.00
1,800.00
Accounts receivable
10.00
Cash on hand
10,000.00
7,500.00
5,000.00
2,500.00
Total Assets
$129,717.42
$140,967.62
$150,557.33
$171,675.51
LIABILITIES
Mortgages payable
Accounts payable
Notes payable to banks
Amounts due brokers
$ 2,635.94
Total Liabilities
0
0
0
$ 2,635.94
Net Worth
$129,717.42
$140,967.62
$150,557.33
$169,039.57
Increase in net worth
$ 11,250.20
$ 9,589.71
$ 18,482.24
Income tax payments
3,301.26
10,627.03
20,403.93
Life insurance premiums
595.82
595.82
595.82
Living expenses
4,000.00
4,000.00
4,000.00
Gifts to children
9,280.00
Gift tax payment
Net income
$ 19,147.28
$ 24,812.56
$ 52,761.99
Less: 50% of long-term
(330.00)
(2,411.46)
capital gains on securities
Net taxable income
$ 19,147.28
$ 24,482.56
$ 50,350.53
ASSETS
12-31-45
12-31-46
12-31-47
Cash in banks
$ 51.36
$ 17,069.30
$ 827.89
Henkel Pool Room
Paramount Billiards - Hickory
Paramount Billiards -
Mooresville
Jones Sales Co.
(1,107.92)
Jones Manufacturing Co.
11,317.54
144,715.02
Real estate
49,263.06
63,059.64
61,634.64
Stocks and bonds
413,736.26
220,658.50
222,954.00
Notes receivable
1,650.00
Accounts receivable
794.33
794.33
Cash on hand
Total Assets
$463,592.76
$312,899.31
$430,925.88
LIABILITIES
Mortgages payable
$ 6,636.31
$ 6,636.31
Accounts payable
11,253.33
10,605.72
Notes payable to banks
$190,000.00
100,000.00
Amounts due brokers
38,350.08
36,493.37
35,996.31
Total Liabilities
$228,350.08
$ 54,383.01
$153,238.34
Net Worth
$235,242.68
$258,516.30
$277,687.54
Increase in net worth
$ 66,203.11
$ 23,273.62
$ 19,171.24
Income tax payments
12,655.76
10,903.95
Life insurance premiums
5,337.76
5,337.76
5,491.61
Living expenses
4,000.00
4,000.00
4,000.00
Gifts to children
6,000.00
6,000.00
Gift tax payment
80.00
Net income
$ 94,196.63
$ 49,515.33
$ 28,742.85
Less: 50% of long-term
(3,221.41)
(13,807.21)
(734.20)
capital gains on securities
Net taxable income
$ 90,975.22
$ 35,708.12
$ 28,008.65
*28 Petitioner, on his Federal income tax returns for the years 1942 through 1947, reported net income as follows: Net Income
Year
Reported
1942
$22,552.72
1943
30,545.37
1944
44,331.49
1945
23,705.19
1946
10,467.34
1947
(28,945.92) Loss
For the year 1948, respondent determined against petitioner and his wife a deficiency in income tax and also an addition to tax for fraud, in the respective amounts of $211.22 and $105.61. Such determinations were based upon use of a net worth computation; and included therein were assets, liabilities, and nondeductible expenditures which were attributable not only to petitioner and his wife, but also to their children. Ultimate Facts Petitioner's books and records are incomplete and inaccurate as to all taxable years involved; and they are insufficient to truly reflect his income for any of such years. Petitioner, during each *29 of the years from 1942 through 1946, engaged in selling coin-operated machines which were held by him primarily for sale to customers in the ordinary course of his trade or business. At least part of the deficiency for each of the years 1944 through 1947 is due to fraud with intent to evade tax. Opinion As heretofore stated, all of the deficiencies determined against petitioner J. L. Jones for the years 1942 through 1947 (Docket No. 57636) were determined by use of the so-called net worth method. The first issue is whether, in here applying such method, there should be included among the assets in the opening net worth of petitioner J. L. Jones, as of December 31, 1941, an amount representing his investment in the Jones Sales Company that is greater than $50,098.28. This amount not only was used by the respondent in the net worth statement attached to his notice of deficiency, but it also has been included by us in the corrected net worth statement set forth in our Findings of Fact. Petitioner contends that he had 1,075 slot machines on hand at December 31, 1941; and that since, concededly, no allowance has been made therefor in the above-mentioned amount of $50,098.28 representing *30 his investment in the Jones Sales Company, the determinations of taxable income computed on the basis of said net worth statement are arbitrary. We are satisfied that the petitioner did own slot machines on December 31, 1941, although we are not satisfied that the number was as great as he claims. But ownership of the machines is not the critical question; rather such question is, what if any adjusted basis petitioner had for such slot machines on the above-mentioned date. The evidence herein will not support a finding that he had any undepreciated and adjusted basis therefor. As we have heretofore found as a fact, the evidence does not establish, either the identity of any particular machine which he possessed, or when it was purchased, or what was the original cost thereof, or to what extent such cost had theretofore been recovered through depreciation allowed or allowable by application of the 3-year "life" which petitioner employed. Also, we are satisfied from the evidence that the respondent's agents did make all reasonable efforts to discover what, if any, adjusted basis was attributable to any slot machines on hand at December 31, 1941. Respondent's agent Ramsey testified that *31 he knew that petitioner had some slot machines then on hand; but that he could not discover, after obtaining the material book entries from the certified public accountant whom petitioner had retained to assist him at the trial, nor was he furnished, evidence which would establish any adjusted basis therefor. Moreover, the other accountant (Risch), who prepared petitioner's income tax returns and whom petitioner testified had been given access to all the current records and bank accounts, included in petitioner's 1942 income tax return the amount of $38,897.96 as "Inventory 12-31-41 (Depreciated Cost)." Also petitioner's representatives included in the balance sheet for the Jones Sales Company as of December 31, 1941, which they attached to their protest, this same amount of $38,897.96 as representing "Machines used on routes" as of December 31, 1941. Petitioner has failed to show that this amount, included both in the return and the submitted balance sheet, is erroneous. Accordingly we have accepted said figure; and we conclude that the respondent did not act arbitrarily when he included such amount of $38,897.96 for "Machines used on routes," in determining that petitioner's total *32 net investment in the Jones Sales Company as of December 31, 1941, was the above-mentioned amount of $50,098.28. We hold that no additional amount should be included in petitioner's opening net worth to reflect an adjusted basis for slot machines on hand. 2. Under the second issue, petitioner contends that he is entitled to have gains from sales of coin-operated machines which he owned on December 31, 1941, and thereafter sold during the years 1942 through 1946, given the preferential capital gain treatment accorded by section 117(j) of the 1939 Code. Respondent, on the other hand, contends that petitioner is not entitled to such treatment, on the ground that during said period, he was engaged in a business of holding and selling both these particular coin-operated machines and others, to customers in the ordinary course of business; and hence that the preferential treatment provided by section 117(j) is not here available. [6] We agree with the respondent. *33 We have hereinbefore found as a fact that petitioner was engaged in holding and selling coin-operated machines to customers in the ordinary course of his business. The evidence establishes that, during each of the years 1942 through 1945, petitioner made large purchases of slot machines for the admitted purpose of rebuilding and selling the same. He advertised his machines for sale in various trade journals. He assiduously sought to build good will among his "customers," and to establish a reputation for selling only machines which were in first class condition. He reported sales of machines in large amounts, through his use of inventories, in each of the years 1942 through 1945. He described himself on his tax returns as a "jobber"; and he therein described the income from the machine sales as being from a "jobbing business." We are satisfied from all the evidence, that he actually was in a business of selling to customers coin-operated machines of all types; and that his stock-in-trade embraced not only those machines which he bought for resale, but also whatever machines he may have owned at December 31, 1941. All of said machines were so commingled in such stock-in-trade that the *34 sale of any particular machine can not here be separately identified. There is no merit in petitioner's contention that he was merely "liquidating" the Jones Sales Company throughout the period from 1942 through 1946. Moreover, even liquidating activities may be prosecuted with such vigor as to constitute in themselves a business. , affd. (C.A. 9) ; , affd. (C.A. 9) , certiorari denied . These cases give recognition to the principle that, if a liquidating operation is conducted with the usual attributes of a business and is accompanied by frequent sales and a continuity of sales operation, then the operation is that of a business, and the proceeds of the sales are taxable as ordinary income. The factors enumerated in the preceding paragraph show that petitioner's activities were so extensive and were conducted in such manner, as to constitute a business and make said principle here applicable. We hold that in computing petitioner's income for the years 1942 through 1946 by use of the net worth method, no adjustment should be made under section 117(j) for capital gain treatment *35 in respect of any of his sales of coin-operated machines. We further hold that the correct amounts of petitioner's taxable income for all of the years from 1942 through 1947, are those set forth in the net worth statement which we have included in our Findings of Fact. As regards the taxable year 1948 (involved in Docket No. 57637), the Commissioner, as in the preceding years, employed the net worth method in determining the deficiency against petitioner and his wife. Petitioners presented no evidence tending to establish any error in said determination; but the respondent, on his brief herein, has now conceded that the amount of the taxable income which he determined to be $6,317.62, should now be reduced to $5,447.49 in order to reflect the elimination from his net worth statement of all assets and liabilities attributable to the petitioners' children. We approve, for lack of contest by petitioners, the amount of the deficiency determined by respondent for the year 1948, after adjustment thereof to reflect his concession. 3. The final issue for consideration is whether any part of the deficiency for each of the years 1944 through 1947, is due to fraud with intent to evade tax within *36 the meaning of section 293(b) of the 1939 Code. [7] Such issue is factual; and the burden rested on respondent to prove fraud by clear and convincing evidence. Section 1112, 1939 Code. We think that he has borne such burden. As regards the years 1944 through 1947, (unlike the year 1942 as to which a dispute existed as to the amount of one of the assets) the amounts of all assets and liabilities have been stipulated by the parties; and the amounts so stipulated reveal that petitioner consistently understated his income by large amounts on his returns throughout said period. The amounts of taxable income reported by the petitioner for the years 1944 through 1947, the correct taxable incomes for said years which we have heretofore found on the basis of the parties' stipulation, and the resultant understatements of taxable income for said years, are as follows: Taxable
Correct
Income
Taxable
Under-
Year
Reported
Income
statement
1944
$44,331.49
$ 50,350.53
$ 6,019.04
1945
23,705.19
90,975.22
67,270.03
1946
10,467.34
35,708.12
25,240.78
1947
(28,945.92) (loss)
28,008.65
56,954.57
Total
$49,558.10
$205,042.52
$155,484.42
*37 In , the Supreme Court held that "evidence of a consistent pattern of underreporting large amounts of income" would support "an inference of willfulness." Also, in , affirming so far as here pertinent , the Court of Appeals for the Third Circuit said: Even if this case were devoid of the usual indicia of fraud, the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. See , * * *; . * * * To the same effect, see . Moreover, this case is not devoid of other indicia of fraud. Petitioner admitted that he pocketed proceeds from sales of slot machines, without recording the sales on the books of his proprietorship, and without depositing the proceeds in the proprietorship's bank account. We are not persuaded that petitioner was telling the truth, when he asserted that such action represented merely an effort on his part to recover his investment in the slot *38 machines - fully depreciated or not as they may have been. Also, petitioner surely must have been aware of the existence of such unreported income; for he made investments in stocks, bonds, real estate, and life insurance in amounts far in excess of the income reflected in his returns or that he could otherwise account for. After hearing the petitioner testify and observing his demeanor, after having given consideration to all the relevant facts and circumstances established by the evidence, and after having taken into consideration the principles of the above-cited cases, we are impelled to conclude, and we here hold, that at least part of the deficiency for each of the years 1944 through 1947, is due to fraud with intent to evade tax within the meaning of section 293(b). Decisions will be entered under Rule 50. Footnotes
*. Includes victory tax.
1. Public Laws of North Carolina (1923 Sess.) Chapter 138, sections 1, 2, and 5; Consol. Stats. (1924), Section 4437(a); General Statutes of North Carolina (1953 Compilation) Chapter 14, sections 14-301, 14-303. ↩
2. Public Laws of North Carolina (1937 Sess.), Chapter 196, sections 1-6; General Statutes of North Carolina (1953 Compilation), Chapter 14, sections 14-304, 14-309.↩
3. Statutes in force during the time when petitioner had slot machines in Bristol are now codified in the Code of Virginia, 1950, sections 18-291 through 18-295.↩
*. Not revealed by the record.↩
4. Petitioner testified that portions of his books and records were lost in 1949, while being moved from one location to another for storage. He said: "You know probably in opening the truck some of them probably blew away, or something."↩
5. All items in this statement are included in or based upon the stipulation of facts filed by the parties hereto, at the time of the trial. The evidence does not warrant any adjustment being made thereto. In said statement, all assets and liabilities of petitioner's wife and children have been eliminated, pursuant to stipulation of the parties.↩
6. Section 117(j)(1) specifically provides that the term "property used in the trade or business" does not include: "(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."↩
7. As hereinbefore stated, the respondent has abandoned his claim to additions to tax for fraud, in respect of the taxable years 1942, 1943 and 1948.↩